KING et al. v. UNITED STATES et al.

Civ. No. 292–T.

United States District Court, N. D. Florida, Tallahassee Division.

June 29, 1951.

942

Lewis W. Petteway, D. Fred McMullen and Guyte P. McCord, Jr., Tallahassee, Fla., for plaintiffs.

F. C. Hillyer, Jacksonville, Fla., M. W. Wells, Orlando, Fla., Frank W. Gwathmey and James A. Bistline, Washington, D. C., for intervenors.

John F. Baecher, Washington, D. C., George Earl Hoffman, Pensacola, Fla., Allen Crenshaw, Washington, D. C., for defendant.

Before McCORD, Circuit Judge, DE VANE, Chief Judge, and WHITEHURST, District Judge.

DE VANE, Chief Judge.

This is an action brought by the Florida Railroad and Public Utilities Commission, and the members thereof, against the United States of America, under Title 28 U.S.C. § 1336 and others, seeking to permanently enjoin, set aside and annul an order of the Interstate Commerce Commission affecting intrastate rates and charges in the State of Florida. Two shortline railroads, the Florida Citrus Commission, Growers and Shippers League of Florida and numerous shippers intervened as parties plaintiff. The Interstate Commerce Commission and all Class I railroads operating in Florida, intervened as parties defendant.

The case arises out of a report and order of the Interstate Commerce Commission, Docket No. 30140; 278 I.C.C. 41, entered in a case entitled "Increase in Florida Intrastate Rates." The suit is brought to enjoin and set aside the order of the Interstate Commerce Commission, dated July 25, 1950, of which the report is made a part.

The order, complained of, directed the raising of rates and charges for the intrastate transportation of freight over the lines on all railroads operating in the State of Florida to correspond with increases that had theretofore been made in interstate freight rates and charges. It was made pursuant to authority vested in Interstate Commerce Commission under provisions of Section 13(3, 4) and Section 15(1) of the Interstate Commerce Act, Title 49 U.S.C.A. §§ 13(3, 4), and 15(1). The circumstances leading to the investigation by the Interstate Commerce Commission in Docket No. 30140 are briefly summarized below.

In a proceeding known as Ex Parte 162, Increased Railway Rates, Fares and Charges, 1946, 266 I.C.C. 537, the Interstate Commerce Commission, in response to a petition filed by all Class I railroads

of the United States, conducted an investigation of interstate railroad freight rates and charges. Upon the showing made by the petitioning railroads of rapidly mounting operating costs and declining passenger revenue, the Interstate Commerce Commission authorized a general increase of 20% in basic interstate freight rates and charges throughout the United States, with certain variations applicable to individual commodities.

Subsequently, in Ex Parte 166, Increased Freight Rates, 1947, 269 I.C.C. 33, 270 I.C.C. 81; 270 I.C.C. 93 and 270 I.C.C. 403, the Interstate Commerce Commission conducted a further general investigation of interstate freight rates and charges. Upon the showing made by the petitioning carriers of the continued increases in operating costs and declining passenger revenue, the Interstate Commerce Commission, finding the existence of an emergency, at first authorized an immediate interim increase of 10% in the interstate freight rates and charges, with certain exceptions, which were to continue pending the completion of the investigation. 269 I.C.C. 33.

In the second report in this proceeding the 10% interim increase previously authorized was raised to an interim increase of 20% 270 I.C.C. 81. In the third report, 270 I.C.C. 93, the interim increases theretofore allowed were superseded by general percentage increases, varying in amounts in the different territorial divisions of the country, the increases authorized within the territory in which Florida is located being 25% with certain variations as to particular commodities.

In the fourth and final report in this case the general increase of 25% was continued and made permanent, with various modifications and variations on individual commodities. 270 I.C.C. 403.

The parties are not in entire agreement as to the average percentage increases allowed by the Interstate Commerce Commission in its several decisions, but the question is not of importance in the decision of this case and the percentages used above are for illustrative purposes only and fairly well represent the increases authorized.

Following the action of the Interstate Commerce Commission in Ex Parte 162 and 166, the railroads operating in Florida, (as did the railroads operating in every other State in the United States), made application to the Florida Railroad and Public Utilities Commission to authorize like increases in intrastate rates in the State of Florida. In Florida Commission Docket N Florida. In Florida Commission Docket No. 1538, considering the increases granted by the Interstate Commerce Commission in its Docket No. 162, the Florida Commission granted the full increases requested, except that no increases were allowed on 1) logs moving to the mills, 2) wet phosphate moving from the washer to the drying plant, 3) waste wood moving to retort or recovery plant, and 4) sugar cane moving to the mills. Also increases on pulpwood were limited to 9%.

In Docket No. 1466, by a series of orders, the Florida Commission dealt with applications of the rail lines for general increases similar to those embraced in the Interstate Commerce Commission Ex Parte No. 166 proceeding.

In Order No. 1466(A), the Florida Commission granted the full 20% increases in effect at that time (April 9, 1948) under orders of the Interstate Commerce Commission in its Docket Ex Parte No. 166, with the following exceptions:

1. No increases were allowed on protective services.

2. No increases were allowed on waste wood to Pensacola, Florida.

3. No increases were allowed on sugar cane from the fields to the mill in Clewiston, Florida.

4. No increases were allowed on fertilizer and fertilizing material.

5. Increases on road aggregates were limited to 10%.

6. Increases on class rates and rates made in relation thereto were limited to 10.25%.

In the No. 1466(C) Order, the Florida Commission continued the 20% increases granted in its Order No. 1466(A) until July 1, 1949, retaining in effect the same

944

exceptions above mentioned. By Order No. 1466(D) these increases and exceptions were continued in effect until after the disposition of Docket No. 30140 by the Interstate Commerce Commission.

Thus, the record in this case shows that in Florida, on intrastate traffic, the Florida Commission granted the rail lines the same increases in freight rates as were granted by the Interstate Commerce Commission in Dockets, Ex Parte No. 162 and No. 166, with the exception of the 5% granted by the Interstate Commerce Commission in Ex Parte No. 166 and the commodity and class rate exceptions hereinbefore enumerated.

The case instituted by the carriers before the Interstate Commerce Commission, Docket No. 30140, was for the purpose of securing an order of the Interstate Commerce Commission authorizing the carriers to also put into effect the increases in rates approved by the Interstate Commerce Commission for interstate traffic, but disapproved by the Florida Commission on intrastate traffic.

Since the Interstate Commerce Commission issued its order making the full interstate rates prescribed by it effective on intrastate traffic in Florida, certain changes have been made in rates applicable to road aggregates, waste wood, sugar cane, fertilizer and fertilizing materials, the latter applicable only on the Florida East Coast Railroad. Otherwise, rates prescribed by the Interstate Commerce Commission, for interstate traffic, have also been made effective by the Interstate Commerce Commission for the movement of intrastate traffic in Florida.

The respective parties to this suit appear to be in accord on the proposition that the Interstate Commerce Commission heard and determined Ex Parte No. 162 and No. 166 primarily as revenue cases. They also appear to be in accord that the carriers are making substantial profits out of their over-all freight services and that, considered alone, increases in freight rates would not have been justified on the ground that the carriers needed additional revenue to pay the costs of rendering freight services and a fair return on the carriers' property devoted to such services. The parties are further in accord that the carriers are sustaining heavy losses resulting from passenger operations. Moreover, the evidence before the Interstate Commerce Commission in this case clearly establishes these facts. We conclude from this evidence that the increases in rates authorized by the Interstate Commerce Commission, in Docket No. 30140, were authorized chiefly because of losses resulting from passenger operations. Increased labor costs accounted for some increased expenses of the carriers, but the principal losses being incurred arose out of passenger operations.

The question, therefore, before the court is—may the Interstate Commerce Commission increase freight rates generally to enable the carriers to meet deficits incurred from passenger operations?

Plaintiffs contend this may not be done; that every branch of the service must contribute its proper share of the costs of operation and return on the property devoted to each class of service. They rely upon the 5% Case, 31 I.C.C. 351, Northern Pacific Railway v. North Dakota, 236 U.S. 585, 35 S.Ct. 429, 59 L.Ed. 735, Norfolk & Western Railway v. Conley, 236 U.S. 605, 35 S.Ct. 437, 59 L.Ed. 745 and other cases to the same effect.

The cases relied upon by plaintiffs to support this proposition were decided prior to 1940 when the Interstate Commerce Act was amended by including therein the National Transportation Policy, which the Interstate Commerce Commission was directed to follow in prescribing rates and charges on all modes of transportation subject to the provisions of the Act, 49 U.S. C.A. note preceding § 1. In Railroad Commission v. Chicago, B. & Q. R. Co., 257 U.S. 563, 42 S.Ct. 232, 66 L.Ed. 371, and again in Florida v. U. S., 292 U.S. 1, 54 S.Ct. 603, 605, 78 L.Ed. 1077, the Supreme Court of the United States held that the Transportation Act, 1920, imposed an affirmative duty on the Interstate Commerce

Commission "to fix rates and to take other important steps to maintain an adequate railway service for the people of the United States." And, again in North Carolina v. United States, 325 U.S. 507, 65 S.Ct. 1260, 89 L.Ed. 1760, the Supreme Court re-affirmed these earlier holdings and held that where intrastate traffic was not contributing its fair share of the revenue required to enable the carriers to render adequate and efficient transportation service an order of the Interstate Commerce Commission directing an increase in intrastate rates, for such purpose, would be valid, if supported by evidence justifying the order.

Relying upon these decisions of the Supreme Court of the United States, this court finds and holds that the Interstate Commerce Commission, in this case, had the authority to enter the order here questioned for the purpose of providing the carriers with needed revenue, even though freight rates were increased beyond the point where such rates provided more revenue than was required to pay the costs for rendering freight services and a fair return on carriers' property devoted to such services.

Plaintiffs contend that should the court find that the Interstate Commerce Commission is vested with authority to increase freight rates, generally, to enable the carriers to meet deficits from passenger operations, nevertheless, the order of the Interstate Commerce Commission, in this case, does not comply with all the requirements laid down by the Supreme Court of the United States in North Carolina v. United States, supra. We think it does.

While it is doubtful if the order of the Interstate Commerce Commission, in Docket No. 30140, could be sustained, on the grounds that the action of the Florida Commission resulted in undue and unreasonable advantage, preference or prejudice, as between persons and localities, in intrastate commerce in Florida on the one hand and interstate commerce on the other, Florida v. U. S., 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291, yet, it is clear from the evidence in the case that it did result in undue, unreasonable and unjust discrimination against interstate commerce and undue preference as to intrastate commerce, in violation of Section 13(4) of the Interstate Commerce Act, in that it failed to place upon intrastate commerce the burden cast upon such commerce, by the order of the Interstate Commerce Commission, entered in Ex Parte No. 162 and No. 166, which was intended to provide needed revenue from both intrastate and interstate commerce, to meet the money requirements of the carriers. The Interstate Commerce Commission found, in this case, that failure of the Florida Commission to authorize increases in the rates in question, resulted in a loss of, at least $915,325 per annum to the carriers. And, as evidence of the need for this revenue, counsel for the Florida Commission stated, on oral argument, and in their brief, that the three major railroads operating in Florida sustained deficits from passenger operations of $21,000,000, for the year, 1948, the last full year's operations involved in this case.

The intervening plaintiffs interested in specific rates involved in this case attacked the validity of the order of the Interstate Commerce Commission on the ground that the rates prescribed are so high that the carriers, in fact, lose revenue instead of gain revenue, which was the sole purpose of the increases in rates and the purpose sought to be accomplished failing, the order prescribing the rates is illegal. They introduced evidence before the Interstate Commerce Commission supporting their contention. The carriers introduced evidence denying the claims of the shippers. The Interstate Commerce Commission considered all this evidence and, after weighing it, decided against the intervening plaintiffs. This court does not have the authority to over-ride the decision of the Interstate Commerce Commission on this factual question, supported by evidence as it is in this record. Ohio v. U. S., 292 U.S. 498, 54 S.Ct. 792, 78 L.Ed. 1388.

Plaintiffs contend further that conceding the power of the Interstate Commerce Commission to increase freight rates,

946

solely for the purpose of obtaining needed additional revenue to meet passenger deficits, yet every shipper affected by such order had the right to put in issue before the Interstate Commerce Commission, and put in issue before this court, the reasonableness of any specific rate applicable to any particular commodity.

The court is cited to and find no authority that sustains this contention of the intervening plaintiffs. Moreover, if they were right in their contention the effect would be to nullify the Declared Policy of Congress, incorporated in the Interstate Commerce Act.

Since the Interstate Commerce Commission has been vested with the power to increase freight rates, generally, to give carriers needed additional revenue, increases of this character, in fairness to all, should be made to apply to intrastate as well as interstate commerce, otherwise unjust discrimination would exist between such commerce.

█ If the intervening plaintiffs are entitled to relief in so far as any specific individual rate is concerned he may take his case to the Interstate Commerce Commission and there secure any modification to which he is entitled. In North Carolina v. United States, supra, the Supreme Court, on this point, said: "The very nature of such a broad general order requires that it contain a saving clause for future modification and adjustment of particular rates." This saving clause was incorporated in the order of the Interstate Commerce Commission in this case and certain of the rates incorporated in the original order entered by the Interstate Commerce Commission have already been modified or removed from the order and the court has no doubt that in the future additional modifications may be made where they are justified by the facts.

We conclude that the order of the Interstate Commerce Commission should be sustained.