KING ET AL., CONSTITUTING THE FLORIDA
RAILROAD AND PUBLIC UTILITIES COM-
MISSION, *v.* UNITED STATES ET AL.

No. 9. Argued October 15, 1952.—Decided December 22, 1952.

*Lewis W. Petteway* argued the cause and filed a brief for appellants.

*Charles H. Weston* argued the cause for the United States and the Interstate Commerce Commission, appellees. With him on the brief were *Acting Solicitor General Stern, Acting Assistant Attorney General Clapp, James L. Morrisson* and *Edward M. Reidy. Philip B. Perlman,* then Solicitor General, and *Daniel W. Knowlton* were on a motion to affirm.

*Frank W. Gwathmey* argued the cause for the Atlantic Coast Line Railroad Co. et al., appellees. With him on the brief was *James A. Bistline.*

*Arnold H. Olsen,* Attorney General, *Charles V. Huppe,* Assistant Attorney General, and *Edwin S. Booth* filed a brief for the State of Montana et al., as *amici curiae,* urging reversal.

MR. JUSTICE BURTON delivered the opinion of the Court.

The questions here are: (1) whether the Interstate Commerce Commission, in prescribing intrastate freight rates for railroads under § 13 (4) of the Interstate Com-

merce Act,[1] may give weight to deficits in passenger revenue; and (2) whether the findings of the Commission which are involved in this proceeding are sufficient to sustain the rates it has prescribed. Our answer to each question is in the affirmative.

This is an action against the United States brought in the United States District Court for the Northern District of Florida, under 28 U. S. C. (Supp. V) § 1336, by appellants "as and Constituting the Florida Railroad and Public Utilities Commission." They ask the court to enjoin, set aside and annul an order of the Interstate Commerce Commission requiring Florida railroads to establish intrastate freight rates which will reflect the same increases as have been authorized by it for comparable interstate traffic.

The underlying proceedings originated in 1940. The Interstate Commerce Commission then undertook a nationwide investigation of interstate railroad freight rates, under §§ 13 (2) and 15a (2) of the Interstate Commerce Act, in conformity with the National Transporta-

---

[1] "(4) Whenever in any such investigation [where rates made by authority of a state are in issue] the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any *undue, unreasonable, or unjust discrimination against interstate or foreign commerce,* which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding." (Italics supplied.) 41 Stat. 484, 49 U. S. C. § 13 (4).

tion Policy stated in § 1 of the Transportation Act of 1940.[2] The investigation dealt with past and future freight and passenger operations, intrastate as well as interstate. A Committee of Cooperating State Commissioners sat with the Commission and took part in its deliberations. Mounting railroad operating costs and declining passenger revenue led the Commission, in 1946, to authorize a nationwide increase of 20% in basic interstate freight rates. *Ex Parte No. 162, Increased Railway Rates, Fares, and Charges, 1946,* 264 I. C. C. 695, 266 I. C. C. 537.[3]

In 1947, the Commission found such further increases in operating costs and decreases in passenger revenue that it authorized an additional nationwide interim increase of 10% in interstate freight rates. Soon it raised this to 20%. In a third report it varied the percentage in different areas, with the result that in the southern territory, including Florida, the increase was 25%. The 1948 final report confirmed this 25% increase. *Ex Parte No. 166, Increased Freight Rates, 1947,* 269 I. C. C. 33, 270 I. C. C. 81, 93, and 403. The Commission's estimates of revenue contemplated the application of the increased rates to intrastate, as well as to interstate, transporta-

---

[2] § 13 (2), 36 Stat. 550, as amended, 41 Stat. 484, 49 U. S. C. § 13 (2); § 15a (2), 54 Stat. 912, 49 U. S. C. § 15a (2); § 1 of the Transportation Act of 1940, inserting a preamble to the Interstate Commerce Act, 54 Stat. 899, 49 U. S. C., note preceding § 1.

[3] For earlier reports see *Ex Parte No. 148, Increased Railway Rates, Fares, and Charges, 1942,* 248 I. C. C. 545. The several proceedings under §§ 15a or 13 (4) referred to in this opinion deal at length with many commodity and other rates or charges besides those which are controlled by the general percentage increases referred to in the opinion. While such variations are important and significant in adjusting each order to specific situations, their consideration is not necessary to the determination of the issues before us. The percentages used in this opinion are those which were adopted by the court below for illustrative purposes. 101 F. Supp. 941, 943–944.

tion.[4]   The report concludes with the statement that the "Committee of Cooperating State Commissioners . . . authorize us to state that they concur in the foregoing report."   270 I. C. C. 403, 463.

Upon publication of these reports, the railroads asked their respective state authorities to authorize comparable increases in intrastate rates.   The Florida Commission approved most of the increases but declined to approve the final increase from 20% to 25%.[5]

On petition of the Florida railroads, the Interstate Commerce Commission undertook its own investigation of Florida intrastate railroad rates under § 13 (3) and

---

[4] In *Ex Parte No. 166*, 270 I. C. C. 403, 421, the tabulations of overall percentage increases in freight rates include intrastate traffic.   The report says: "The table which relates to class I railroads, covers all traffic, intrastate as well as interstate, and assumes increases to have been approved on intrastate traffic similarly to those upon interstate traffic in the same territory, for the whole time."   In referring to revenue from operations for a "constructive," normal year, the report says: "This estimate is upon the assumption that timely similar adjustments will be made upon intrastate traffic."   *Id.,* at 428.   As to rates of return on property values, it adds: "They presuppose that generally similar increases will be permitted by State authorities on intrastate traffic, or may become effective otherwise."   *Id.,* at 437. See also, 269 I. C. C. at 39, 94–95, and 270 I. C. C. at 440.

[5] In response to requests based upon *Ex Parte No. 162, supra,* the Florida Commission granted the original 20% general increase in intrastate freight rates but declined to allow increases in intrastate rates on logs moving to the mills, wet phosphate moving from the washer to the drying plant, waste wood moving to retort or recovery plant and sugar cane moving to the mills.   It also limited rate increases on pulpwood to 9%.   In response to requests to conform to *Ex Parte No. 166, supra,* the Florida Commission granted the additional 20% general increase in intrastate freight rates, but declined to approve the further 5% increase.   It also made specific exceptions in favor of certain commodities.   As the issues with which we are concerned are sufficiently raised by the Florida Commission's action denying the final 5% increase, we confine our discussion to that item.

(4) of the Interstate Commerce Act, 41 Stat. 484, 49 U. S. C. § 13 (3) and (4). A full hearing was had before a Commissioner and an examiner, followed by a hearing upon exceptions to the examiner's report.[6] The Commission recommended that intrastate freight rates be established "between points in Florida which will reflect the same increases as are, and for the future may be, maintained by respondents [railroads] on like interstate traffic to and from Florida, and within Florida under our authorizations in Ex Parte No. 162 and Ex Parte No. 166 . . . ." Finding No. 8, 278 I. C. C. 41, 73.

The Interstate Commerce Commission then gave the Florida Commission a final opportunity to permit the increased rates to be applied to intrastate transportation. Upon the latter's failure to act, the Interstate Commerce Commission ordered the railroads "thereafter to maintain and apply for the intrastate transportation of freight from and to points in the State of Florida freight rates and charges which shall be no lower than the approved rates and charges, or on the approved rate bases, as provided in said report."[7]

---

[6] While the Commission states that its conclusions differ from those in the proposed report of the examiner, they do not so differ on the issues before us.

[7] For other decisions of the Commission as to intrastate rates under § 13 (3) and (4), growing out of *Ex Parte Nos. 162* or *166, supra,* see *Increases in Alabama Freight Rates and Charges,* 274 I. C. C. 439; *Texas Intrastate Rates,* 273 I. C. C. 749; *Increases in Tennessee Freight Rates and Charges,* 272 I. C. C. 625. See also, *Increases in Arizona Freight Rates and Charges,* 270 I. C. C. 105. A recent decision, growing out of *Ex Parte No. 168, Increased Freight Rates, 1948,* 276 I. C. C. 9, is *Montana Intrastate Freight Rates and Charges,* 284 I. C. C. 167. The intrastate rates there ordered into effect by the Commission were set aside in *Montana* v. *United States,* 106 F. Supp. 778, and 786; judgment vacated and cause remanded by this Court for further consideration in the light of the instant case, *post,* p. 905.

Before that order took effect, this action was filed. A three-judge District Court was convened. 28 U. S. C. (Supp. V) § 2325. Two short line railroads and numerous shippers intervened as plaintiffs. The Interstate Commerce Commission and all Class I railroads operating in Florida intervened as defendants. The entire record of the proceeding before the Commission, under § 13 (4), was introduced. The court sustained the Commission and dismissed the complaint. 101 F. Supp. 941. That judgment is here on appeal. 28 U. S. C. (Supp. V) §§ 1253, 2101 (b).

I. *The Interstate Commerce Commission in prescribing intrastate freight rates for railroads under § 13 (4) of the Interstate Commerce Act may give weight to deficits in passenger revenue.*

In *Ex Parte No. 168, Increased Freight Rates, 1948,* 272 I. C. C. 695, 276 I. C. C. 9, the Commission reviewed the changing attitudes it has adopted concerning the role of passenger deficits and freight rates. In such cases as the *Five Per Cent Case,* 31 I. C. C. 351, the Commission in 1914 concluded that each class of service should completely and independently provide its own proportionate share of expenses and profits.[8] In 1949 the Commission says:

"However, because of changed theories adopted by Congress in the Transportation Act, 1920, and

---

[8] The Commission there said:

"We know of no provision of law under which we should be justified in increasing freight rates to provide a return upon property used exclusively in the passenger service, much less to take care of losses incurred in such service. In our opinion each branch of the service should contribute its proper share of the cost of operation and of return upon the property devoted to the use of the public." 31 I. C. C. at 392.

because as a practical matter the increasing degree of unprofitableness of the passenger traffic menaced the continuity of an adequate national system of transportation, we were forced to a more comprehensive view of this question. We observe, also, that at the time of those decisions the railroads enjoyed a practical monopoly in supplying transportation, but that situation no longer exists." 276 I. C. C. at 34.

Citing with approval its similar views in *Ex Parte No. 103, Fifteen Per Cent Case, 1931,* 178 I. C. C. 539, and *Ex Parte No. 123, Fifteen Per Cent Case, 1937–1938,* 226 I. C. C. 41, the Commission summarizes its present position as follows:

"These cases are typical of our more recent holdings upon this question. While we regard it as 'trite to say that each particular service, coach, sleeper, parlor car, and head end, should as nearly as may be pay its own way and return a profit' (*Eastern Passenger Fares in Coaches,* 227 I. C. C. 17, 25), and we have accepted the contention that there may be traffic that should not be burdened with a shortage of passenger service return (*Livestock, Western District Rates,* 190 I. C. C. 611, 629), yet, if passenger service inevitably and inescapably cannot bear its direct costs and its share of joint or indirect costs, we have felt compelled in a general rate case to take the passenger deficit into account in adjustment of freight rates and charges. Both the freight and passenger services are essential, and revenue losses or deficits on the one necessarily must be compensated by earnings on the other if the carriers are to continue operations. Both may be subjected to reasonable rates and charges to produce the fair aggregate return, even though thereby a higher rate of return may be exacted from the one than from the

other. (*Property Owners' Committee* v. *Chesapeake & O. Ry. Co.*, 237 I. C. C. 549, 565.)" *Id.*, at 35. See also, *Ex Parte 87, Revenues in Western District,* 113 I. C. C. 3, 23.

This change of policy was the inevitable consequence of steadily increasing passenger operating costs, together with the growth of vigorous competition from automobiles and other forms of transportation which made it futile to compensate for the passenger deficits by increasing passenger rates. The railroads were forced to abandon passenger mileage, reduce service and improve their facilities, while fixing passenger rates at a level as adequate as competition permitted.[9]

In recent years, a nationwide passenger deficit has been obvious except during the peak of wartime passenger traffic. The ratio between passenger operating expense and revenue has varied in different areas but has been uniformly unfavorable to the railroads.[10]

---

[9] Passenger service involves not only transportation of people but of mail, express, baggage, milk and other "head-end" services requiring the speed and service of passenger trains. These operations have shown a national operating deficit in each year from 1936 through 1948. 276 I. C. C. at 38.

[10] ". . . Between the end of 1923 and the beginning of the present year [1948], the miles of line operated in passenger service of the class I roads decreased from 224,762 to 159,373 . . . or 29.1 percent in 26 years. . . . In addition to total abandonments, much curtailment of service has occurred, which is impossible to portray statistically.

.     .     .     .     .

". . . From 1923 through 1933 both the number of passengers carried and the revenues from passenger fares declined uninterruptedly. Passengers carried declined from slightly less than 1 billion in the earlier year to less than half that figure, or 433 millions, in round numbers, in the later year. Revenues from passenger fares fell from $1,148 millions to $329 millions, a decline between these 2 years of more than 70 percent. This development was accompanied, except

Section 15a (2) of the Interstate Commerce Act and the National Transportation Policy of 1940 [11] reflect this broad concept of the unity of the Nation's transportation system. They direct the Commission to consider,

for 1 year, by an uninterrupted increase in the passenger service operating ratio from 81.29 percent in 1923 to 101.22 percent in 1930, the latter being the first year of the 11 years 1920–30 in which there was an operating deficit in this service. Since that year there has been an annual operating deficit in passenger service, except during the war years 1942–45.

.      .      .      .      .

*"Passenger service operating ratios and net railway operating deficits in 1948, by specified districts and regions*

| District or region | Operating ratio | Net railway operating deficit |
|---|---|---|
| Eastern district | 120. 8 | $216, 450, 000 |
| Pocahontas region | 177. 8 | 35, 725, 000 |
| Southern region | 127. 3 | 72, 982, 000 |
| Western district | 132. 2 | 234, 625, 000 |
| Total | 127. 4 | 559, 782, 000" |

276 I. C. C. at 36, 40; see also, pp. 14–31 for data as to value, revenue, expenses, operating income, rate of return, traffic, efficiency, etc., and pp. 32–40 as to passenger deficits.

See Moulton, The American Transportation Problem, c. V (1933); 63d, 64th and 65th Annual Reports of the Interstate Commerce Commission, at pp. 3, 5 and 41, respectively.

[11] "In the exercise of its power to prescribe just and reasonable rates the Commission shall give due consideration, among other factors, to the effect of rates on the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management to provide such service." 54 Stat. 912, 49 U. S. C. § 15a (2).

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes

among other things, the need, in the public interest, of adequate and efficient railway transportation service and the need of revenues sufficient to sustain such service. It permeates such general revenue proceedings as *Ex Parte Nos. 162* and *166, supra.* It leaves no ground for a claim that the Commission may not give weight to passenger revenue deficits in prescribing *interstate* freight rates to meet over-all revenue needs. See *United States* v. *Louisiana,* 290 U. S. 70.

The question remains whether that Commission may give weight to deficits in passenger revenue (either interstate or intrastate) when prescribing *intrastate* freight rates under § 13 (4). It is conceivable that some considerations properly given weight by the Commission in prescribing interstate freight rates in a general revenue proceeding might not be applicable equally to transportation within a particular state.

In the instant case, however, there is no showing that the character of operating conditions in Florida intrastate passenger traffic differs substantially from that of inter-

---

of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." 54 Stat. 899, 49 U. S. C., note preceding § 1.

state passenger operations in the southern territory generally. On the contrary, the Commission observes that—

> "Increased passenger deficits, by reason of the continuing rise in operating expenses and the growing use of other forms of transportation, is a condition bearing alike upon intrastate and interstate rates. There is here no claim or showing that the passenger deficits of the respondents do not result from intrastate as well as interstate operations, and the passenger deficit of the East Coast, which operates entirely within Florida, would appear to indicate to the contrary.

> "The record affords no justification for a difference in treatment in this respect [passenger deficits] between Florida intrastate traffic, on the one hand, and interstate traffic to and from Florida, on the other hand. The question of passenger deficits is a serious one for both carriers and shippers, and would become even more serious for interstate shippers if this burden were imposed entirely upon them [rather than being shared on a like basis with intrastate shippers on the same lines]." 278 I. C. C. at 67–68. See opinion below, 101 F. Supp. at 944.

It appears from the report in *Ex Parte No. 168*, 276 I. C. C. at 40, that, in 1948, the passenger service operating ratio for the southern territory was 127.3% while the operating ratios of the three principal Florida railroads in that year were 120%, 127% and 128%. In Florida, moreover, the discontinuance of railroad passenger service would not permit the discontinuance of high-speed tracks and equipment because of the need for fast freight schedules to transport perishable fruits and vegetables from Florida. The Commission dealt with the freight and passenger revenues and properties of the Florida roads as a

whole when determining the need for increases in interstate freight rates. Nothing has been demonstrated which would demand different treatment of these properties in relation to the intrastate activities.

The Commission also finds that "the Florida intrastate rates [without the 5% increase] . . . are abnormally low and are not contributing their fair share to the revenues required by respondents [Florida railroads] to enable them to render adequate and efficient service and to operate profitably, and thereby accomplish the purpose of the Interstate Commerce Act . . . ." Finding No. 5, 278 I. C. C. at 72.

In the instant case there is no evidence which would require the Commission to treat Florida intrastate rates differently from interstate rates in southern territory. Instead, there are findings that it would cause unjust discrimination against interstate commerce in Florida if the intrastate freight rates are not increased so as to reflect the same increase as is applied by the Commission to like interstate traffic in the southern territory. See note 13, *infra*.

The same National Transportation Policy applies to § 13 (4) as to § 15a (2). Whichever section is used, the same economic considerations underlie the relation between freight rates and passenger deficits, whether interstate or intrastate. This was well considered throughout the opinion of the Court in *United States* v. *Louisiana, supra.* It was there said:

"This Court has consistently held that this section [§ 13 (4)] is to be construed in the light of § 15a (2) and as supplementing it, so that the forbidden discrimination against interstate commerce by intrastate rates includes those cases in which disparity of the latter rates operates to thwart the broad purpose of § 15a to maintain an efficient transportation system by enabling the carriers to earn a fair return. So

construed, § 13 (4) confers on the Commission the power to raise intrastate rates so that the intrastate traffic may produce its fair share of the earnings required to meet maintenance and operating costs and to yield a fair return on the value of property devoted to the transportation service, both interstate and intrastate." Pp. 74-75.

This was confirmed in *Florida* v. *United States,* 292 U. S. 1, 5-6.

We conclude that there is no reason why the Commission may not give weight to passenger deficits in prescribing the intrastate freight rates in Florida, as it does in prescribing interstate freight rates for the southern territory.[12]

II. *The Commission's findings involved in this proceeding are sufficient to sustain the rates prescribed.*

Several of the Commission's findings which lend support to its order are printed in the margin.[13] Its author-

---

[12] *Northern Pacific R. Co.* v. *North Dakota,* 236 U. S. 585, and *Norfolk & W. R. Co.* v. *Conley,* 236 U. S. 605, favor, rather than oppose, this position. In those cases this Court enjoined state authorities from attempting to restrict an intrastate railroad to confiscatorily low freight or passenger rates. Such action, however, carried no implication that the United States' authority to provide relief is limited to cases of threatened confiscation. In the instant case the Interstate Commerce Commission is authorized by Congress, under §§ 15a (2) and 13 (4), to override state-prescribed rates which unjustly discriminate against interstate commerce, whether or not the state rates are also confiscatory.

[13] "2. That the transportation *conditions incident to the intrastate transportation of freight in Florida are not more favorable* and such conditions in the Florida peninsula are somewhat less favorable than those (1) within southern territory and (2) between Florida and interstate points.

"3. That the *present interstate freight rates* and charges within Florida and between points in Florida and points in other States

ity to prescribe the rates now before us rests on the provision, in § 13 (4), that when it finds that an intrastate rate causes "any undue, unreasonable, or unjust discrimination against interstate or foreign commerce . . ." it shall prescribe such rate as, in its judg-

---

*are just and reasonable* . . . and that *intrastate rates,* charges, and minimum weights *herein approved will not exceed a just and reasonable level.*

.     .     .     .     .

"5. That the *Florida intrastate rates,* charges, and minimum weights, *which are below the level herein authorized, are abnormally low and are not contributing their fair share to the revenues* required by respondents to enable them to render adequate and efficient service and to operate profitably, and thereby accomplish the purpose of the Interstate Commerce Act, and as set forth in the national transportation policy declared by the Congress, to develop and preserve a national transportation system adequate to meet the needs of the commerce of the United States, of the postal service, and of the national defense; and that the *burden thus cast upon interstate commerce is undue* to the extent that these intrastate rates and charges are less than they would be on the basis herein approved.

"6. That the establishment of *intrastate rates* and charges *increased sufficiently to equal the level herein approved will substantially increase respondents' revenues therefrom, and will constitute not more than a fair proportion of respondents' total income* . . . .

"7. That the maintenance of *intrastate rates* and charges *within Florida on bases lower than those herein approved causes, and in the future will cause, (1) in all instances, unjust discrimination against interstate commerce,* (2) in nearly all instances, undue preference of and advantage to localities in intrastate commerce, and undue prejudice to localities in interstate commerce; . . . .

"8. That this unjust discrimination and undue prejudice should be removed by establishing intrastate rates and charges between points in Florida which will reflect the same increases as are, and for the future may be, maintained by respondents on like interstate traffic to and from Florida, and within Florida under our authorizations in Ex Parte No. 162 and Ex Parte No. 166, modified as herein indicated and as proposed before the Florida commission in proceedings referred to herein: . . . (5) that no intrastate rate or charge shall be increased so that it will exceed the lowest level of the corresponding rates or charges contemporaneously maintained generally on inter-

ment, will remove the discrimination. Note 1, *supra.*
The Commission's finding No. 7 meets this requirement.
The Commission there finds that the maintenance of the
existing intrastate rates within Florida "on bases lower
than those herein approved causes, and in the future will
cause, (1) in all instances, unjust discrimination against
interstate commerce . . . ." 278 I. C. C. at 73. If sup-
ported by adequate subsidiary findings, this ultimate find-
ing thus sustains the authority of the Commission and the
validity of its order.[14] *North Carolina* v. *United States,*
325 U. S. 507, 514; *Florida* v. *United States,* 292 U. S. 1;

---

state traffic to and from Florida points in the period from August 21,
1948, to, but not including, January 11, 1949; . . . .

"These findings are *without prejudice to the right* of the author-
ities of the State of Florida, or any other interested. party, *to apply
for a modification thereof as to any specific intrastate rates* or charges
on the ground that they are not related to the interstate rates or
charges on like traffic in such a way as to contravene the provisions
of the Interstate Commerce Act." (Italics supplied.) 278 I. C. C.
at 72–74.

[14] An alternative provision of § 13 (4) is that whenever in such
an investigation the Commission finds that an intrastate rate causes
"any undue or unreasonable advantage, preference, or prejudice as
between persons or localities in intrastate commerce on the one hand
and interstate or foreign commerce on the other hand . . . it shall
prescribe the rate . . . thereafter to be charged . . . in such manner
as, in its judgment, will remove such advantage, preference, prejudice,
or discrimination." Note 1, *supra.* On this point the Commission's
finding No. 7 states that the maintenance of intrastate rates in Florida
"on bases lower than those herein approved causes, and in the future
will cause . . . (2) in nearly all instances, undue preference of and
advantage to localities in intrastate commerce, and undue prejudice to
localities in interstate commerce; . . . ." 278 I. C. C. at 73. As to
this alternative provision, see also, *Wisconsin R. Commission* v.
*Chicago, B. & Q. R. Co.,* 257 U. S. 563; *Houston, E. & W. T. R. Co.*
v. *United States,* 234 U. S. 342. In view of the above restricted
finding and of the doubt expressed by the court below as to the ability
of the Commission to sustain its action on that ground, we place no
reliance upon this alternative here.

282 U. S. 194; *United States* v. *Louisiana,* 290 U. S. 70. The court below adds that it is "clear from the evidence in the case that it [the existing intrastate rate] did result in undue, unreasonable and unjust discrimination against interstate commerce . . . ." 101 F. Supp. 941, 945.

The nature and adequacy of the findings necessary to support an ultimate finding of "unjust discrimination against interstate commerce" were considered in *North Carolina* v. *United States, supra.* In that case this Court held that the Commission's findings were not adequate to support the Commission's order to raise state-wide intrastate passenger rates from 1.65 cents per mile to 2.2 cents per mile, although the latter rate was prescribed by the Commission as a minimum rate for comparable interstate passenger service on the same lines and trains. The finding which was primarily needed, and was there found lacking, was one that the intrastate service at 1.65 cents per mile did not contribute its fair share of the earnings required to meet maintenance and operating costs and to yield a fair return on the value of the property directed to the transportation service, both interstate and intrastate.

This Court held that the mere disparity between the rates for comparable intrastate and interstate service was not enough *per se* to establish the requisite unjust discrimination. Confronted with evidence that the interstate rate of 2.2 cents per mile was above a reasonable rate level for comparable intrastate passenger service, a finding supported by evidence was held to be necessary to show the contrary. Such a finding, lacking in the *North Carolina* case, is supplied here by finding No. 3, which states that the "intrastate rates . . . herein approved will not exceed a just and reasonable level." 278 I. C. C. at 72.

In the *North Carolina* case there was no finding that the existing intrastate rate was inadequate. In fact, its

ample adequacy was indicated by evidence of an extraordinarily large volume of available traffic and profits. In contrast, the Commission, in the instant case, has found that the existing "Florida intrastate rates . . . which are below the [proposed] level herein authorized, are abnormally low and are not contributing their fair share to the revenues . . . and that the burden thus cast upon interstate commerce is undue to the extent that these intrastate rates . . . are less than they would be on the basis herein approved." Finding No. 5, *id.*, at 72–73, and see 45–59. The report adds that "the revenue loss as estimated by the respondents [railroads] because of the failure to authorize the increases herein sought is $915,325 a year." *Id.*, at 65.

Whereas in the *North Carolina* case there was evidence to indicate that the conditions in that State were more favorable to profitable intrastate transportation of passengers than in the Nation at large, here the Commission's finding No. 2 expressly states that "the transportation conditions incident to the intrastate transportation of freight in Florida are not more favorable and such conditions in the Florida peninsula are somewhat less favorable than those (1) within southern territory and (2) between Florida and interstate points." *Id.*, at 72, and see 63–67.

Supporting the conclusion that the proposed increase in the Florida intrastate freight rates will not drive away business but will prove profitable and reasonable, the Commission in its finding No. 6 says that "the establishment of intrastate rates . . . increased sufficiently to equal the level herein approved will substantially increase respondents' [railroads'] revenues therefrom, and will constitute not more than a fair proportion of respondents' total income . . . ." *Id.*, at 73.

The foregoing findings cover the needs emphasized in the *North Carolina* case. They go far beyond the bare disparity between the existing intrastate rate and the

proposed minimum rate which is in substantial uniformity with the interstate rate. These findings demonstrate that the proposed rate in Florida will be within the zone of reasonableness and, in the opinion of the Commission, will cause the intrastate freight traffic to contribute a fair share of the earnings.

The Commission has applied to the Florida operations the same conclusion it reached as to the need for increased revenue on a national basis and has distributed the burden within Florida along the same lines it followed when estimating the revenues available in the southern territory from intrastate as well as interstate operations. In the absence of any showing that it is not applicable to Florida, the evidence which forms the basis of the Commission's nationwide order becomes the natural basis for its Florida order.

The Commission in the instant case has provided that these "findings are without prejudice to the right of the authorities of the State of Florida, or any other interested party, to apply for a modification thereof as to any specific intrastate rates . . . on the ground that they are not related to the interstate rates . . . on like traffic in such a way as to contravene the provisions of the Interstate Commerce Act." *Id.*, at 74. Certain of the rates in the original order already have been modified or removed from that order. 101 F. Supp. at 946.

No question has been raised here as to the adequacy of the evidence upon which any of the findings are based. Although no such point is urged, supporting evidence appears in the record of the "full hearing" under § 13 (4), all of which was introduced in evidence in the court below. Much of the factual material that was before the Commission in *Ex Parte No. 162* and *Ex Parte No. 166,* and the reports in those cases, were before the Commission and the court below in the present proceedings. To permit such material and reports to be applied under § 15a

but not under § 13 (4) would be contrary to the complementary nature of those sections.

> "The decision in the first proceeding, that the increase in interstate rates was reasonable, was made in the hope that the state commissions would bring intrastate rates into harmony. When they failed to do so, the Commission reaffirmed its finding that the new interstate rates were reasonable and found that the intrastate rates must be raised in order that the intrastate traffic may bear its fair share of the revenue burden. It is plain from the nature of the inquiry that the rate level, to which both classes of traffic were raised, was found reasonable on the basis of the traffic as a whole. Where the conditions under which interstate and intrastate traffic move are found to be substantially the same with respect to all factors bearing on the reasonableness of the rate, and the two classes are shown to be intimately bound together, there is no occasion to deal with the reasonableness of the intrastate rates more specifically, or to separate intrastate and interstate costs and revenues. Compare *American Express Co.* v. *Caldwell,* 244 U. S. 617; *United States* v. *Louisiana, supra* [290 U. S. 70]; *Florida* v. *United States, ante* [292 U. S.], p. 1." *Illinois Commerce Commission* v. *United States,* 292 U. S. 474, 483–484. See also, *Montana* v. *United States,* 106 F. Supp. 778, 783.

The appellants point out that in the *North Carolina* case, this Court mentioned the absence of other findings. Those, however, are not needed to sustain an order already supported by such findings as have been made in this case.[15]

---

[15] See *Illinois Commerce Commission* v. *United States, supra; Florida* v. *United States,* 292 U. S. 1; *United States* v. *Louisiana, supra; Louisiana P. S. Commission* v. *Texas & N. O. R. Co.,* 284

For example, the *North Carolina* case mentions the absence in that case of a finding that the existing 1.65 cent per mile intrastate passenger rate was confiscatory. Such a finding, supported by competent evidence, would have provided a constitutional ground for enjoining the state rate. See *Norfolk & Western R. Co.* v. *Conley,* 236 U. S. 605; *Northern Pacific R. Co.* v. *North Dakota,* 236 U. S. 585. The Interstate Commerce Commission's jurisdiction over intrastate rates, however, is not limited to cases where those rates are confiscatory. It is sufficient that the existing intrastate rates cause "unjust discrimination against interstate or foreign commerce . . . ." In that event, § 13 (4) directs the Commission to prescribe intrastate rates that will remove the discrimination without raising the rate beyond the zone of reasonableness. See *United States* v. *Louisiana, supra,* at 74–75; *Florida* v. *United States,* 282 U. S. 194, 211; *Wisconsin R. Commission* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563, 585–586.

Similarly, the *North Carolina* case mentions, but does not make indispensable, the specific findings in dollars which were absent there. Reference was made in the *North Carolina* case to the absence of "findings as to what contribution from intrastate traffic would constitute a fair proportion of the railroad's total income" and also to the absence of any "finding as to what amount of revenue was required to enable these railroads to operate efficiently." 325 U. S. at 516. The Court emphasized the Commission's reliance on "the mere existence of a disparity between what it said was a reasonable interstate rate and the intrastate rate fixed by North Carolina."

U. S. 125; *Alabama* v. *United States,* 283 U. S. 776; *Georgia P. S. Commission* v. *United States,* 283 U. S. 765; *New York* v. *United States,* 257 U. S. 591; *Wisconsin R. Commission* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563.

*Ibid.* In the instant case the Commission does not rely upon the mere disparity between the intrastate and interstate rates. On the contrary, the Commission states that the Florida intrastate rates "are abnormally low and are not contributing their fair share to the revenues required . . . to render adequate and efficient service and to operate profitably, and thereby accomplish the purpose of the Interstate Commerce Act . . . ." Finding No. 5, 278 I. C. C. at 72. Also, in finding No. 6, it says that the establishment of the proposed increases in intrastate rates "will substantially increase respondents' revenues therefrom, and will constitute not more than a fair proportion of respondents' total income . . . ." *Id.,* at 73. More is not needed. It is not necessary, for general revenue purposes, to establish for each item in each freight rate a fully developed rate case.

"[T]he administrative arm of the Commission [would be] paralyzed, if instead of adjudicating upon the rates in a large territory on evidence deemed typical of the whole rate structure, it were obliged to consider the reasonableness of each individual rate before carrying into effect the necessary increased schedule." *United States* v. *Louisiana,* 290 U. S. 70, 75–76, and see 78–79. See also, *Illinois Commerce Commission* v. *United States,* 292 U. S. 474, 483; *Florida* v. *United States,* 292 U. S. 1, 9; *Georgia P. S. Commission* v. *United States,* 283 U. S. 765, 774; *Wisconsin R. Commission* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563, 588. Where the Commission seeks to deal generally with rates and revenues in a large area on evidence typical of the area as a whole, it may proceed by way of a general order supported by sufficient evidence applicable to the whole territory.[16] At the same time it

---

[16] In its report the Commission says "where, as is the case here, the intrastate and the interstate traffic, as a whole, moves under substantially similar conditions, and the expense of handling the two

is well for it to leave the way open, as it did here, for modifications of that general order in specific situations where the general order is not justly applicable. *North Carolina* v. *United States, supra,* at 518, 535.

For these reasons, we conclude that the findings before us sustain the order of the Commission and that the Commission was authorized to give the weight it did to passenger deficits when prescribing intrastate freight rates. The judgment accordingly is

*Affirmed.*

MR. JUSTICE BLACK is of opinion that the facts found by the Commission were not adequate to support the order and would set aside the order on authority of *North Carolina* v. *United States,* 325 U. S. 507.

MR. JUSTICE DOUGLAS, with whom MR. CHIEF JUSTICE VINSON concurs, dissenting.

The Court has taken an unprecedented and, in my view, an unwarranted step in enlarging the authority of the Interstate Commerce Commission. It upholds the power of the Commission to raise *intrastate* freight rates, not because they favor intrastate over interstate commerce, not because they fail to yield their fair share of the carriers' revenue, but because the carriers' *interstate* passenger operations are losing money.

The power of Congress to regulate *intrastate* rates stems from its authority to promote and protect interstate commerce. See *Shreveport Rate Case,* 234 U. S.

---

classes of traffic are inextricably woven together, an attempt to do the impossible, namely an attempt to show costs of intrastate service segregated from interstate costs, together with similarly segregated valuation of carrier property, would serve no useful purpose." 278 I. C. C. at 66.

342.[1] By § 13 (4) of the Act, the Commission is empowered to regulate *intrastate* rates which are found to be discriminatory. The key to this regulatory authority is *discrimination against interstate commerce,* which presupposes that somehow or other the particular intrastate rates interfere with or prejudice interstate commerce. This principle is explicit in § 13 (4) [2] and in the decisions of the Court, both before and after the enactment of § 13 (4).[3]

---

[1] As Mr. Justice Hughes speaking for the Court in the *Shreveport* case said (234 U. S., p. 351): "Congress is empowered to regulate,— that is, to provide the law for the government of interstate commerce; to enact 'all appropriate legislation' for its 'protection and advancement' (*The Daniel Ball,* 10 Wall. 557, 564); to adopt measures 'to promote its growth and insure its safety' (*County of Mobile* v. *Kimball, supra*); 'to foster, protect, control and restrain' (*Second Employers' Liability Cases, supra*). Its authority, extending to these interstate carriers as instruments of interstate commerce, necessarily embraces the right to control their operations in all matters having such a close and substantial relation to interstate traffic that the control is essential or appropriate to the security of that traffic, to the efficiency of the interstate service, and to the maintenance of conditions under which interstate commerce may be conducted upon fair terms and without molestation or hindrance."

[2] The relevant portions of § 13 (4) read: "Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. . . ."

[3] See *Shreveport Rate Case, supra; American Express Co.* v. *South Dakota,* 244 U. S. 617; *Wisconsin Commission* v. *Chicago, B. &*

In this case there is no rational relation between *intra-state freight* rates and *interstate passenger* operations. The present level of freight rates in Florida neither hampers nor obstructs the free flow of interstate passenger transportation. They do not affect its quantity or flow. There is, therefore, no basis for a finding of discrimination against interstate commerce.

The Commission, of course, is authorized to regulate intrastate rates so that intrastate operations will provide a fair share of the carriers' revenue.[4] See *Wisconsin Commission* v. *Chicago, B. & Q. R. Co.*, 257 U. S. 563. But that authority rests on the Commission's power to remove discrimination. If, for example, intrastate freight operations fail to produce an adequate return as determined by reference to the cost of the intrastate operations and the investment in the intrastate business, interstate commerce is discriminated against. But there is no such failure in this case. Intrastate freight operations in Florida are amply profitable and carry their fair share of the load. The Commission nevertheless has saddled the intrastate freight business with the deficits from the interstate passenger business. If there is any discrimination here, it is against the local Florida shipper.

---

*Q. R. Co.*, 257 U. S. 563; *Florida* v. *United States*, 282 U. S. 194; *Georgia Commission* v. *United States*, 283 U. S. 765; *Louisiana Commission* v. *Texas & N. O. R. Co.*, 284 U. S. 125; *United States* v. *Louisiana*, 290 U. S. 70; *North Carolina* v. *United States*, 325 U. S. 507.

[4] Section 15a (2) of the Act reads in pertinent part: "In the exercise of its power to prescribe just and reasonable rates the Commission shall initiate, modify, establish or adjust such rates so that carriers as a whole . . . will, under honest, efficient and economical management and reasonable expenditures for maintenance of way, structures and equipment, earn an aggregate annual net railway operating income equal, as nearly as may be, to a fair return upon the aggregate value of the railway property of such carriers held for and used in the service of transportation . . . ."

The Commission surmises but does not find that the intrastate passenger rates contribute to the passenger deficits of the carriers. But there is no showing that either the intrastate passenger rates or the intrastate freight rates do in fact contribute to these deficits. Moreover, even if we assume that intrastate passenger rates do contribute to the passenger deficits, we do not know the amount. The absence of these material findings (see *North Carolina* v. *United States,* 325 U. S. 507) indicates to me the short cut which the Commission is taking to enlarge its jurisdiction to unprecedented limits.