Stewart, J.
We are of the opinion that the commission erred in its order with reference to the question of what costs of operating the service or facility should be considered, pursuant to Section 504-3, General Code.
The railroad desires only the discontinuance of the passenger service of the trains, all freight service to be taken care of on other trains of the railroad.
It is conceded that as long as the railroad gives adequate freight service no action can be taken by the commission in that respect.
*321 Since both logic and reason dictate that the commission is bound to consider only the passenger revenues and expenses in arriving at the cost of the passenger service which is sought to be discontinued, the out-of-pocket loss to the railroad, without any regard to allocation of the system-wide cost of transportation, is unreasonably enormous, as hereinbefore shown.
What are the factors with reference to the welfare of the public to which, under the statute, due regard must be given?
Practically all the evidence of the protestants consists of the testimony of 14 residents of seven small communities and is to the effect that there was occasionally a demand for passenger service. An examination of the testimony of these witnesses will demonstrate that only seven of them claimed they ever used the passenger service of the trains in question; four, not using the passenger service, testified as to such use by others in their communities; two were concerned with either mail or freight problems, which of course are not now relevant to the question which must be decided; and one failed to testify on either point.
The witnesses who occasionally as passengers used the trains were from the villages of Good Hope, which is served by bus facilities, Beaver, Fruitdale, Jeffersonville and South Solon.
The only witness from Bainbridge was its mayor, who did not testify that he used the trains but testified that the people of Bainbridge used them slightly, so that, as a matter of fact, the communities of Beaver, Fruitdale, Jeffersonville and South Solon are the only ones which have complained that the discontinuance of the trains would leave them without common-carrier facilities.
In 1950, the people of Beaver and Fruitdale accounted for only three per cent of the passenger use of the trains, which is less than eight-hundredths passenger per mile per day.
*322 Bus service remains available to all but 11 of the small stations along the route of the trains, and in 1951 the passengers at these particular stations represented about 15 per cent of the total passenger business on both trains. Therefore, it follows that 85 per cent of all the passengers using the trains have bus service available to them, and most of the small communities without such service are within a very few miles of other towns having either bus or railroad facilities.
When one considers the enormous loss incurred in maintaining the passenger service on the trains, contrasted with the trifling use of the service by the public, it is difficult to perceive how it can be considered that the public welfare outweighs the cost of maintaining the service.
It is true that the passenger service on trains Nos. 1 and 2 is all of such service furnished by the railroad between Springfield and Jackson, but, even so, if the public demand for such service is so insignificant as to be trivial, the railroad should not be compelled to furnish that service at such enormous loss to itself.
In the case of City of Delphos v. Public Utilities Commission, 137 Ohio St., 422, 30 N. E. (2d), 688, this court considered an order of the Public Utilities Commission which permitted the discontinuance of two mixed trains operated by the Nickle Plate Railroad, the service of which was enjoyed by many business men along the route, and the withdrawal of which would cause them much inconvenience.
This court said:
“On the other hand, the record shows that the revenue from passenger, mail and express service on these trains has been gradually decreasing over the past six or eight years, while the expenses of operating the trains have increased. Furthermore, there is no showing that there is any reasonable hope that the *323 volume of such service will increase, or that it may become profitable. The record shows that while these trains on the whole have been operating at a profit, that profit is derived wholly from the freight service. The operation, so far as passenger, mail and express service are concerned, entails a constant loss.
“In this connection, some facts and figures furnished by the record reflect a situation which calls for serious consideration. The trains in question were formerly operated for passenger service only. Diminishing returns and increased expense of operating required their discontinuance and there was substituted the mixed train service which is now operating. «: # #
“The railroad offered evidence to the effect that the total cost of operating these two trains was now in excess of $156,000 per year; that if their operation was eliminated, the freight service now hauled by them could be shifted to other freight trains at an operating cost not to exceed $70,000 per year, resulting in a profit of $86,000. This sum, less the revenues from passenger, mail and express service in the sum of $41,000 per year, would leave a net profit of $45,000 to be made by the change.
“In other words, the railroad claims that it is suffering a loss of $45,000 per year in order to provide the passenger service returning a revenue of only $4,700 per year.”
Concluding, this court quoted with approval, as follows, the finding of the commission:
“ ‘The record fairly construed indicates that these two trains operated as mixed trains are at least breaking even financially, not giving effect, however, to certain fixed charges. It was testified that if these trains had been operating strictly as straight passenger trains, the out-of-pocket loss to the company would have been annually $100,000, yet Mr. Ayres, Cleveland, *324 Ohio, general manager of the applicant, says that if the company was to be permitted to rearrange its freight service and to abandon passenger service, it would thereby effect a net annual savings of $45,000.
“ ‘It is apparent to us that if this passenger service could be eliminated, applicant thereby would be placed in a position whereby it could effect a substantial saving.’ ”
It is true that in the Delphos case this court said that it would not substitute its judgment for that of the commission. That principle has many times been enunciated by this court. However, in that case this court did approve the proposition that, in considering the cost of operating the service or facility, only the operation of the passenger, mail and express service was relevant.
In the present case we again reiterate our conclusion that we shall under no circumstances substitute our judgment for that of the commission but that our only inquiry is whether the order of the commission is reasonable and lawful or unreasonable or unlawful.
The commission contends that the present case differs from the Delphos ease in that the railroad concerned in that case was paying no dividends, whereas the railroad in the present case is operating at a profit and paying large dividends. However, we are of the opinion that such facts are not relevant to the questions involved herein. If the public demand for the passenger service were sufficiently great to outweigh the loss in the maintenance of such service, the application for abandonment should be denied, regardless of whether or not the railroad is making a profit. Conversely, if the public demand for the service is so insignificant and the loss so large as to be disproportionate to the public welfare, the application to abandon the service must be granted.
*325 The commission contends also that in the case of King v. United States, 344 U. S., 254, 97 L. Ed., 301, 73 S. Ct., 259, the Supreme Court of the United States decided that the Interstate Commerce Commission in prescribing intrastate freight rates for railroads may give weight to deficits in passenger revenues, and that, therefore, the commission may take cognizance of freight revenues, especially on a mixed train, in determining the question of abandonment of passenger service.
We do not so interpret the King case.
We are of the opinion that the King case holds simply that the Interstate Commerce Commission may give weight to over-all passenger revenue deficits in prescribing freight rates to satisfy over-all revenue needs, and that it has no application to the question of the abandonment of a particular or specific passenger service.
Since we are of the opinion that, when an application is made to discontinue passenger service only, the revenues and costs with reference to such service only can be considered, and since the undisputed evidence in the present case shows an insignificant public demand or need for the passenger service in question and, in relation thereto, an unreasonable cost of operating the service, we find the order of the commission to be unreasonable and, therefore, reverse the same.

Order reversed.

Weygandt, C. J., Taut, Hart, Zimmerman and Lamneck, JJ., concur.
Middleton, J., concurs in paragraphs one, two and four of the syllabus and in the judgment.