PUBLIC SERVICE COMMISSION OF
UTAH and Utah Citizens Rate As-
sociation, Plaintiffs,

v.

UNITED STATES of America and Inter-
state Commerce Commission, Defend-
ants;

and

Union Pacific Railroad Company, The
Denver and Rio Grande Western Rail-
road Company, Southern Pacific Com-
pany, The Western Pacific Railroad
Company, Bamberger Railroad Com-
pany, The Ogden Union Railway and
Depot Company, Salt Lake-Garfield and
Western Railroad Company, Tooele Val-
ley Railway Company, and Utah Rail-
way Company, Intervenors.

Civ. A. No. C-8-56.

United States District Court
D. Utah, Central Division.

May 25, 1956.

804

E. R. Collister, Atty. Gen., Raymond W. Gee, Deputy Atty. Gen., Keith E. Sohm, Commerce Atty., Salt Lake City, Utah, for plaintiff Public Service Commission.

Calvin L. Rampton, Salt Lake City, Utah, for plaintiff Utah Citizens Rate Ass'n.

Stanley N. Barnes, Asst. Atty. Gen., James E. Kilday, E. Riggs McConnell, Attys. Dept. of Justice, Washington, D. C., and A. Pratt Kesler, U. S. Atty., Salt Lake City, Utah, for defendant United States.

Robert W. Ginnane, Gen. Counsel, Charlie H. Johns, Asst. Counsel, I. C. C., Washington, D. C., and George W. Howard, Salt Lake City, Utah, for defendant Interstate Commerce Commission.

Bryan P. Leverich, S. N. Cornwall, A. H. Nebeker, Peter W. Billings, John H. Snow, A. S. Frederickson, and J. E. Morgan, Salt Lake City, Utah, for intervening defendants.

Before PICKETT Circuit Judge, RITTER, Chief Judge, and CHRISTENSON, District Judge.

PICKETT, Circuit Judge.

The Public Service Commission of the State of Utah and the Utah Citizens Rate Association brought this action to set aside and enjoin the enforcement of an order of the Interstate Commerce Commission granting an increase of intrastate freight rates in Utah in a proceeding under § 13(3) and (4) of the Interstate Commerce Act. 49 U.S.C.A. § 13(3), (4).[1] The Class I railroads

1. 49 U.S.C.A. § 13(4), reads as follows: "Whenever in any such investigation the commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage,

operating in Utah intervened. A statutory three-judge court was constituted and an interlocutory injunction granted pending a hearing on the merits of the case.

The underlying proceedings which give rise to this action originated in 1951 before the Interstate Commerce Commission, entitled "Increased Freight Rates 1951", herein referred to as "Ex Parte 175", wherein Class I railroads of the United States sought an overall increase in interstate freight rates. After some percentage increases had been authorized, the Commission, on April 11, 1952, granted increases totaling 15% to all railroads on interstate rates. 284 I.C.C. 589. This increase was subject to certain exceptions and hold-downs. The railroads operating in Utah made application to the Public Service Commission of Utah for increases in intrastate rates in the same percentage as those granted in Ex Parte 175.

The Utah Commission refused to grant the increases and Section 13 proceedings were instituted before the Interstate Commerce Commission, which entered into an investigation of the Utah intrastate rates. A full and complete hearing was had, at which evidence was offered by the railroads and by protestants, including these plaintiffs. The Interstate Commerce Commission, with exceptions, found that the Utah intrastate rates and charges were abnormally low; that conditions incident to intrastate transportation in Utah were not more favorable than those incident to interstate transportation in that state; that traffic thereunder failed to produce its fair share of earnings required to yield the railroads sufficient revenue to provide adequate and efficient railway transportation service to accomplish the purposes of the Interstate Commerce Act, and that Utah intrastate rates cast an undue burden upon interstate commerce. 297 I.C.C. 87.[2] It was also found that

preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding."

2. The Commission's findings (297 I.C.C. 105,) are as follows:

"1. The conditions incident to the intrastate transportation of freight in Utah are not more favorable than those incident to the interstate transportation between Utah and adjoining States.

"2. The amounts and percentages by which interstate freight rates and charges between points in Utah and points in other States were increased, as

authorized in Ex Parte No. 175, are just and reasonable.

"3. The present Utah intrastate rates and charges on carload and less-than-carload freight, except on sugar beets and beet-sugar final molasses destined to sugar factories, and excepting certain rates on coal, sheep, and cattle, hereinafter enumerated, imposed by authority of the State, and abnormally low, and traffic thereunder fails to produce its fair share of the earnings required to yield revenue sufficient to enable the respondents, under honest, economic, and efficient management, to provide adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service, and thereby accomplish the purposes of the Interstate Commerce Act, as set forth in the national transportation system adequate to meet the needs of the commerce of the United States, of the postal service, and of the national defense. The burden thus cast upon intrastate rates and charges are less than they would be on the bases herein prescribed; and these intrastate rates and charges cause, and for the future will cause, undue, unreasonable, and unjust discrimination against interstate commerce.

"4. The undue, unreasonable, and unjust discrimination herein found to ex-

the undue burden and unjust discrimination should be removed by applying to the Utah intrastate rates and charges the interstate increase authorized in Ex Parte 175 on like intrastate traffic. The increases, however, were limited by the provision "that increases may not be made in intrastate rates to levels higher than the interstate rates on like traffic to or from Utah for like or greater short-line distances over the same lines of railroad, except in instances where the interstate rates, and not the intrastate rates, are designated as published to meet motor-carrier competition." It is conceded that the findings meet the requirements of King v. United States, 344 U.S. 254, 73 S.Ct. 259, 97 L.Ed. 301, but it is urged that the evidence does not sustain them.

The Utah Commission did not authorize the increases within the time provided in the order and the railroads were then directed by the Interstate Commerce Commission to make the 15% increase effective on Utah intrastate rates as of March 13, 1956. This action followed.

The matter is before us on the record of the Interstate Commerce Commission proceedings under Section 13. At the opening of the trial the plaintiffs introduced in evidence the Interstate Commerce Commission records and, in addition, offered the record of proceedings made before the Public Service Commission of Utah. The court reserved ruling on the admissibility of the latter record, which had not been introduced in the proceedings before the Commission. It is well settled that when an order of the Interstate Commerce Commission is questioned in an action of this nature, the court shall consider only such matters as were before the Commission prior to the issuance of its order. Tagg Bros. & Moorehead v. United States, 280 U.S. 420, 443, 50 S.Ct. 220, 74 L.Ed. 524; Louisville & Nashville R. Co. v. United States, 245 U.S. 463, 466, 38 S. Ct. 141, 62 L.Ed. 400; State of New York v. United States, 331 U.S. 284, 335, 67 S.Ct. 1207, 91 L.Ed. 1492; Sakis v. United States, D.C., 103 F.Supp. 292, appeal dismissed 344 U.S. 801, 73 S.Ct. 4, 97 L.Ed. 625. The record in the State proceeding is irrelevant and the objec-

---

ist should be removed by applying to the Utah intrastate rates and charges, on the commodities and traffic herein described, the same respective increases as are and for the future may be maintained by the respondents on like interstate traffic between points in Utah and adjoining States under our authorization in Ex Parte No. 175, provided that increases may not be made in intrastate rates to levels higher than the interstate rates on like traffic to or from Utah for like or greater short-line distances over the same lines of railroad, except in instances where the interstate rates, and not the intrastate rates, are designated as published to meet motor-carrier competition.

"5. The establishment of increases in intrastate rates and charges as prescribed in finding 4 will not result in unreasonable rates, or rates that are unreasonable in relation to interstate rates, and will substantially increase the respondents' annual revenues.

"6. The increased revenues to the respondents which will result from the increased rates and charges as provided in finding 4 are required from intrastate traffic in Utah in order to enable the respondents to provide adequate and efficient railway transportation service.

"7. In certain instances it appears that the present Utah intrastate rates are now as high as corresponding interstate rates including the Ex Parte No. 175 increases for comparable distances. The intrastate rates specified below, are excepted from the findings herein:

"Rates on coal, viz.:
  "From Castle Gate to Milford, Utah, slack and other sizes.
  "From Castle Gate to Lund, Utah, slack and other sizes.
  "From Castle Gate to Devil's Slide, Utah, slack.
"Rates on sheep, in double-deck cars, viz.:
  "From Lakeside to Wahsatch, Utah.
  "From Cedar City to Kaysville, Utah.
"Rates on cattle, in single-deck cars, viz.:
  "From Spanish Fork to Ogden, Utah."

tion to its admission in evidence is sustained.

The power of Congress to authorize the Interstate Commerce Commission to establish intrastate rates in order to remove unjust discrimination against interstate commerce is not open to dispute. The plaintiffs here do not question that power, although they do question the reasonableness of the increases in Ex Parte 175. See King v. United States, 344 U.S. 254, 274, 73 S.Ct. 259, 97 L.Ed. 301; Florida v. United States, 282 U.S. 194, 211, 51 S.Ct. 119, 75 L.Ed. 291. It appears quite clear that Congress intended that the railway system of the country shall have a reasonable return to carry out the purposes of the Interstate Commerce Act, which would include compensation for intrastate business reasonably proportionate with the interstate business. Railroad Commission of State of Wisconsin v. Chicago, B. & Q. R. Co., 257 U.S. 563, 588, 42 S.Ct. 232, 66 L.Ed. 371; Illinois Commerce Commission v. United States, 292 U.S. 474, 483, 54 S.Ct. 783, 78 L.Ed. 1371. "The fundamental purpose of the Congress in enacting section 13, subdivisions (3) and (4), was to reach intrastate rates that were found to result in unjust discrimination against interstate commerce." State of Florida v. United States, 282 U.S. 194, 210, 51 S.Ct. 119, 123, 75 L.Ed. 291. The purpose of § 13 (4) is not limited to the removal of unjust and unreasonable discriminations against interstate commerce as it relates to persons and localities, but it imposes on the commission the affirmative duty "to take other important steps to maintain an adequate railway service for the people of the United States." Railroad Commission of State of Wisconsin v. Chicago, B. & Q. R. Co., 257 U.S. 563, 585, 42 S.Ct. 232, 236; State of Florida v. United States, 282 U.S. 194, 51 S.Ct. 119.

In determining the validity of an order of this nature, a reviewing court may not weigh the evidence; it may not negative the action of the Commission, being "one of those agencies presumably equipped or informed by experience to deal with the specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect," if from a consideration of the entire record there is a rational basis for the action. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456. The court may set aside the order, "when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. National Labor Relations Board, supra.

In Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 513, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420, it was said: " * * * 'So long as there is warrant in the record for the judgment of the expert body it must stand. * * * "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." ' Rochester Telephone Corp. v. United States, 307 U.S. 125, 145, 146, 59 S.Ct. 754, 764, 765, 83 L.Ed. 1147; Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 287, 54 S.Ct. 692, 693, 694, 78 L. Ed. 1260."

The principal contention of the plaintiffs is that the evidence does not sustain the finding that the existing intrastate rates cause undue, unreasonable and unjust discrimination against interstate commerce. It is said that the evidence fails because there has been no separation of interstate and intrastate costs and revenues. The evidence is to the effect that there is no distinction in the handling of interstate and intrastate freight shipments. They are both handled on the same trains, by the same crews; the same accounting department, the same traffic department, and the same facilities are used in the dispatch of both shipments. Under such conditions, the contention of the plaintiffs has

been rejected by the courts. King v. United States, supra; Illinois Commerce Commission v. United States, supra; State of North Carolina v. United States, D.C., 128 F.Supp. 718, affirmed 350 U.S. 805, 76 S.Ct. 45. In the Illinois Commerce case, the court said, 292 U.S. 474, 483–484, 54 S.Ct. 783, 787:

"Where the conditions under which interstate and intrastate traffic move are found to be substantially the same with respect to all factors bearing on the reasonableness of the rate, and the two classes are shown to be intimately bound together, there is no occasion to deal with the reasonableness of the intrastate rates more specifically, or to separate intrastate and interstate costs and revenues."

■ This does not mean that there must be a uniformity in interstate and intrastate rates. Intrastate transportation is primarily the concern of the state. The Interstate Commerce Commission is without authority to supplant intrastate rates unless there are findings supported by evidence that conditions exist which may bring § 13(4) into play. To authorize an interference with intrastate rates, it must be shown that the intrastate and interstate traffic are intimately bound together; that the conditions incident to intrastate transportation are no more favorable than those incident to interstate traffic, and that the intrastate rates involved are abnormally low and are not contributing their fair share of the revenue to which the railroads are entitled. The mere existence of a disparity in rates is not enough to warrant interference by the Interstate Commerce Commission. State of North Carolina v. United States, 325 U.S. 507, 516, 65 S.Ct. 1260, 89 L.Ed. 1760. The State Commission has complete control of intrastate rates so long as those rates do not unduly burden or discriminate against interstate commerce.

In finding that such a burden and discrimination existed, the Commission did not rely entirely on the disparity in rates. It was shown that the conditions under which interstate and intrastate traffic move were substantially the same with respect to all factors bearing on the reasonableness of the rates. The railroads' general need for additional revenue was established in Ex Parte 175. There is evidence to the effect that the earnings on the railroads' investments in Utah are below the national average. The economic ability of the Utah traffic to bear the 15% increase found necessary in Ex Parte 175 was shown. The economic conditions in Utah in 1950 had improved greatly over the preceding period, both actually and relatively. Wages were higher than the national average; higher wages and costs of operation which the railroads had to pay in Utah and elsewhere were shown; there had been a substantial increase in the railroads' property investment in the State, while there was a decrease in net operating income. The cost of handling intrastate shipment was found to be as great, if not greater, than the handling of interstate freight. The percentage of return on net investment of the railroads in Utah was 3.82% in 1953, as compared with 3.98% in 1948, 2.58% in 1949, 4.33% in 1950, 3.66% in 1951, and 3.91% in 1952. The record also shows that in 1952 the revenue per ton mile of railroads in the United States was 1.43 cents; in the Western District, 1.393 cents; and in the Mountain Pacific states, which includes Utah, 1.398 cents per ton mile; and in the State of Utah, on intrastate and interstate traffic, 1.258 cents per ton mile. The total annual loss to the railroads caused by the failure to grant the requested increase in Utah was estimated at $1,880,347.[3]

3. In Illinois Commerce Comm. v. United States, 292 U.S. 474, 479, 54 S.Ct. 783, 785, the court said:
"The scope and application of section 13(4), Interstate Commerce Act 49 U.S. C.A. § 13(4), have so recently been fully considered in opinions of this Court in United States v. Louisiana, 290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 181; State of Florida v. United States, 292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. [1077] * * *; see also Georgia Public Service Comm. v.

In State of North Carolina v. United States, D.C., 128 F.Supp. 718, affirmed 350 U.S. 805, 76 S.Ct. 45, the state sought to nullify an order of the Interstate Commerce Commission, applying the Ex Parte 175 rates to intrastate freight in North Carolina. There may be some varying conditions, but on the whole the case was the same as the one before us. In answering the argument that the record did not disclose that the intrastate rates resulted in an undue discrimination against interstate commerce, the court said, 128 F.Supp. at pages 722, 723:

"Plaintiffs contend that there was no sufficient showing of discrimination against interstate commerce and in favor of intrastate commerce resulting from the intrastate rates. It appears, however, that, without the Ex parte No. 175 increases on any of their traffic in 1953, the return on net investment in 1953 for the four principal carriers receiving 87% of the intrastate revenue would have been 0.94% for the Norfolk Southern, 4.63% for the Seaboard, 4.35% for the Southern and a deficit of more than $4,000,000 for the Atlantic Coast Line, or a combined return for the four roads of 2.84%. This is not a case, then, as plaintiffs argue, where an unnecessary increase was granted in a prosperous territory because of a need in other sections. The need for increase existed in North Carolina as these figures show, and the Commission estimated that the total loss from the non-application of the increase in 1953, was $1,500,000. As the cost of handling intrastate freight was shown to be as great as or greater than the handling of interstate freight, the raising of interstate rates without raising intrastate rates necessarily resulted in throwing an undue share of the cost of the service upon interstate transportation. As said by Mr. Justice Stone in Illinois Commerce Commission v. United States, 292 U.S. 474, 485, 54 S.Ct. 783, 787, 78 L.Ed. 1371, 'The effect of maintaining a lower rate, intrastate, than the reasonable interstate rate is necessarily discriminatory wherever the two classes of traffic, inextricably intermingled, are carried on, as in the District, under substantially the same conditions.'

"In Railroad Commission of State of Wisconsin v. Chicago, B. & Q. R. Co., 257 U.S. 563, 586, 42 S.Ct. 232, 236, 66 L.Ed. 371, Chief Justice Taft, speaking for the court, said:

" 'If the railways are to earn a fixed net percentage of income, the lower the intrastate rates, the higher the interstate rates may have to be. The effective operation of the act will reasonably and justly require that intrastate traffic should pay a fair proportionate share of the cost of maintaining an adequate railway system. * * * If that purpose is interfered with by a disparity of intrastate rates, the Commission is authorized to end the disparity by directly removing it, because it is plainly an "undue, unreasonable, and unjust discrimination against interstate or foreign commerce," within the ordinary meaning of those words.' * * * "

In similar cases concerning the same matter, Louisiana Public Service Commission v. United States, D.C., 125 F. Supp. 180, affirmed 348 U.S. 885, 75 S.Ct. 206, 99 L.Ed. 695, sustained the order of the Interstate Commerce Commission,

United States, 283 U.S. 765, 51 S.Ct. 619, 75 L.Ed. 1397; Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291, that it is unnecessary to repeat that discussion here. Under section 13(4) [of the Interstate Commerce Act] the Interstate Commerce Commission is given plenary power to remove the discrimination created by intrastate rates against interstate commerce, by raising intrastate rates so that the intrastate traffic may produce its fair share of the revenue required to meet maintenance and operating costs and to yield a fair return on the value of property devoted to the transportation service."

and Mississippi Public Service Commission v. United States, D.C., 124 F.Supp. 809, affirmed Illinois Central R. R. Comm. v. Mississippi Public Service Comm., 349 U.S. 908, 75 S.Ct. 599, 99 L.Ed. 1244, with one judge dissenting, set aside and enjoined the enforcement of the order.

Plaintiffs' contention that the order relating to the Utah intrastate rates is invalid because of the flat percentage increase of 15% in Ex Parte 175, with a savings clause, was contrary to law, is without merit. The validity of the Commission's order in Ex Parte 175 is not subject to a collateral attack. Callanan Road Imp. Co. v. United States, 345 U.S. 507, 512, 73 S.Ct. 803, 97 L.Ed. 1206; Securities & Exchange Commission v. Central-Illinois Securities Corp., 338 U.S. 96, 143, 69 S.Ct. 1377, 93 L.Ed. 1836; City of Tulsa v. Midland Valley R. Co., 10 Cir., 168 F.2d 252. The determination of just and reasonable rates is for the Commission, not the courts. Montana-Dakota Utilities Co. v. Northwestern Public Service Comm., 341 U.S. 246, 251, 71 S.Ct. 692, 95 L.Ed. 912; Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 304, 57 S.Ct. 478, 81 L.Ed. 659; Interstate Commerce Commission v. Illinois Central R. R. Co., 215 U.S. 452, 470, 30 S.Ct. 155, 54 L.Ed. 280; Manufacturers Ry. Co. v. United States, 246 U.S. 457, 481, 38 S.Ct. 383, 62 L.Ed. 831; Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553. The courts, in appropriate cases, have upheld flat horizontal percentage rate increases which contained a savings clause to prevent injustices. United States v. State of Louisiana, 290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 181; The New England Divisions Case (Akron, C. & Y. R. Co. v. U. S.), 261 U.S. 184, 187, 43 S.Ct. 270, 67 L.Ed. 605; Railroad Commission of Wis. v. Chicago, B. & Q. R. Co., supra.

The plaintiffs urge that the record discloses that the Utah intrastate rates, without the 15% increase, are contributing more, not less, than their fair share of the overall revenue needs of the railroads. The Commission did not so find. While the exhibits, in some instances, show intrastate rates equal to or even higher than interstate service, this may result from varying causes which are not material here. The clear import of the Commission's order is that increases in intrastate rates shall not be made to levels higher than interstate rates for like traffic. The order is also without prejudice to a reexamination as to the lawfulness of any individual Utah intrastate rate on any particular commodity.

We have considered the voluminous record and conclude that the findings of the Commission are supported by substantial evidence. The complaint is dismissed and the interlocutory injunction dissolved; costs to be assessed to the plaintiffs.

CHRISTENSON, District Judge (dissenting).

I dissent from the holding of the majority that there is substantial evidence in the record supporting the order of the Interstate Commerce Commission in this case. There is agreement upon all of the other points decided and with the statement of principles contained in the prevailing opinion. It is submitted, however: (I) that the decisions of the Supreme Court of the United States do not warrant the applications made; (II) that the record itself does not furnish any substantial basis for the Commission's ultimate findings; (III) that to bring the case within the doctrine of Illinois Commerce Commission v. United States, 292 U.S. 474, 54 S.Ct. 783, 78 L. Ed. 1371, unauthorized presumptions would have to be indulged and evidence not before the Court would have to be assumed; and (IV) that the rationale of the decision would mean that increases applied nationwide by the Interstate Commerce Commission, coupled with matters of common knowledge and unwarranted presumptions concerning the inter-relationship of interstate and intrastate traffic, automatically justify corresponding intrastate increases at the

will of the Interstate Commerce Commission—a result at once inconsistent with the relationship between affairs national and local, at variance with controlling decisions, and not in keeping with the national transportation policy itself. The far-reaching issue thus presented will excuse—I believe that it requires— my presuming to state views on the foregoing points as they differ from those of my respected colleagues.

## I.

The prevailing opinion properly recognizes that there need not be uniformity in interstate and intrastate rates; that intrastate transportation is primarily the concern of the state; and that the Interstate Commerce Commission is without authority to supplant intrastate rates unless there are findings supported by evidence that conditions exist which bring Section 13(4) of the Interstate Commerce Act, 49 U.S.C.A. § 13(4), into operation. The most direct and positive way to show jurisdictional facts in dispute here would be to break down operating figures, both as to income and expense, on an intrastate basis in order to permit comparison with corresponding interstate figures. The railroads have said that this is impracticable, and no doubt it is in many cases. The decision in Illinois Commerce Commission v. United States, supra, dispenses with the necessity of producing such figures if certain other facts are shown to exist. The rule requiring such other showing in the absence of the type of direct evidence mentioned is not a mere generality obviating the need of proof. It is a substitute formula to be looked to for the establishment of jurisdiction if, and only if, the elements on which the formula is premised be established.

Illinois stands for the proposition that where the conditions under which interstate and intrastate traffic move are found to be substantially the same with respect to all factors bearing on the reasonableness of the rate, and the two classes are shown to be intimately bound together, there is no occasion to deal with the reasonableness of the intrastate rates more specifically, or to separate intrastate and interstate costs and revenues. It must be noted that it is not sufficient in order to justify the application of this doctrine that the two classes are intimately connected, and it is not sufficient that some conditions affecting the respective rates have common application. It must also appear that conditions are substantially the same with respect to all factors bearing on reasonableness or that conditions incident to the intrastate transportation of freight are not more favorable than those incident to interstate transportation, which latter idea will be included in the concept of "sameness" hereinafter referred to. Logically, as well as from the language of the decision, this seems inescapable. A substantial divergence of some, though not most, of the factors would destroy the very basis of the formula. It should be further observed that in Illinois Commerce Commission v. United States, supra, there was involved a somewhat different factual problem than is presented here. The rates were not statewide, but covered the "Chicago Switching District". The district was essentially a unit as far as switching operations were concerned. Movements were chiefly between local industries and involved a complete service originating and terminating within the district, although the district was intersected by the boundary between the states of Illinois and Indiana.

King v. United States, 344 U.S. 254, 73 S.Ct. 259, 97 L.Ed. 301, determined that the Interstate Commerce Commission in prescribing intrastate freight rates for railroads under Section 13(4) of the Interstate Commerce Act, may give weight to deficits in passenger revenue. The Court held that there was no evidence which would require the Commission to treat Florida intrastate rates differently from interstate rates in southern territory. It was pointed out that whereas, in State of North Carolina v. United States, 325 U.S. 507, 65 S.Ct. 1260, 89 L.Ed. 1760, there was evidence

to indicate that the conditions in that state were more favorable to profitable intrastate transportation of passengers than in the nation at large, the Commission's findings in the King case were to the contrary. No question was raised as to the adequacy of the evidence upon which the findings were based and thus, this case is not very helpful on the crucial problem here.

In State of North Carolina v. United States, supra, the principles are laid down that intrastate transportation is primarily the concern of the state; that the power of the Interstate Commerce Commission with reference to such intrastate rates is dominant only so far as necessary to alter rates which injuriously affect interstate transportations; that before the Commission can nullify a state rate, justification for the exercise of the federal power must clearly appear; and that the Interstate Commerce Commission is without authority to supplant a state-prescribed intrastate rate unless there are clear findings, supported by evidence, of each element essential to the exercise of that power by the Commission. In the light of these principles, the Supreme Court examined the sufficiency of the Commission's findings and found them insufficient to support the order of the Commission. It stated, 325 U.S. at page 512, 65 S.Ct. at page 1263:

"In effect, the Commission's holding was, and its argument is here, that § 13(4) automatically requires complete uniformity in intra-state and interstate rates. That argument is in short that under our national transportation system interstate travelers and intra-state travelers use the same trains; for a state to fix a lower intra-state rate than the interstate rate is therefore an undue advantage to the intra-state passengers and an unfair discrimination against the interstate passengers. If Congress intended to permit such an oversimplified form of proof to establish 'unjust discrimination', then its require-

ment of a 'full hearing' was mere surplusage."

Emphasizing the necessity that the basis of federal jurisdiction appears, it is further said, 325 U.S. at page 511, 65 S.Ct. at page 1263:

"* * * A scrupulous regard for maintaining the power of the state in this field has caused this Court to require that Interstate Commerce Commission orders giving precedence to federal rates must meet 'a high standard of certainty.' Illinois Central R. Co. v. Public Utilities Commission, 245 U.S. 493, 510, 38 S.Ct. 170, 176, 62 L.Ed. 425. Before the Commission can nullify a state rate, justification for the 'exercise of the federal power must clearly appear.' Florida v. United States, 282 U.S. 194, 211, 212, 51 S. Ct. 119, 123, 124, 75 L.Ed. 291".

Four three-judge cases, three of them of recent date and each of them affirmed on motion without opinion by the Supreme Court, touch upon the problem here to varying degrees. They are referred to in the order in which they were decided.

State of New York v. United States, D.C.N.D.N.Y., 1951, 98 F.Supp. 855, 859, affirmed 342 U.S. 882, 72 S.Ct. 152, 96 L. Ed. 662, discussed the matter of similarity of transportation conditions, holding that whether similarity exists is a question of fact. It was stated that the term denotes a general likeness, an approximation, something less than an absolute identity. But the question of similarity was not involved in the way it is here. There was an attack on the similarity of services rendered New York and Connecticut commuters, and it was held that the findings of similarity of service was based upon evidence that appeared to be substantially undisputed. The opinion indicates that on the issue corresponding to the determinative one here, there were cost studies in evidence, and one of the principal disputes was whether the "train by train" method rather than the group method should be followed. The evidence adduced and the consideration

by the Commission of the comparative cost items as indicated by the decision, make it appear that the case is not closely in point except to indicate the general type of proof that has been offered heretofore in rate cases.

In Louisiana Public Service Commission v. United States, D.C.E.D.La., Baton Rouge D., 1954, 125 F.Supp. 180, 183, affirmed 348 U.S. 885, 75 S.Ct. 206, 99 L.Ed. 696, rehearing denied 348 U.S. 921, 75 S.Ct. 291, 99 L.Ed. 723, the question of whether the findings of the Commission were supported by substantial evidence was summarily disposed of in a paragraph of the opinion. It was pointed out that the record comprised nearly one thousand pages of testimony and a great number of exhibits. The Court said:

> "It is sufficient to say that the Commission had before it a large volume of substantial evidence adduced by both sides of the controversy. In reaching its conclusions it was necessary for the Commission to weigh the evidence. That was a function which peculiarly addressed itself to the expertise of the Commission."

Whether the four hundred pages of testimony in the case at bar covered the same fields as the record in the Louisiana case cannot be determined from the opinion. Certainly, the opinion does not settle the point of comparability which is determinative here.

The case of Mississippi Public Service Commission v. United States, D.C.S.D. Miss., Jackson D., 124 F.Supp. 809 (one judge dissenting), affirmed Illinois Cent. R. Co. v. Mississippi Public Service Comm., 1955, 349 U.S. 908, 75 S.Ct. 599, 99 L.Ed. 1244, directly passed upon the question of the sufficiency of the evidence contrary to the contentions of the railroad company. I cannot agree with two indications in the opinion of Judge Mize, who spoke for a majority of the three-judge court: (a) that to justify the order of the Commission it must be shown both that the disparity between rates operates as a discrimination against interstate commerce *and* that it results in injury to interstate shippers; and (b) that in order to justify such an order there must be evidence distinguishing railroads' revenues, expenses and properties as between interstate and intrastate operations. On the first point, it is probable that the use of the conjunctive, with no support in the statute, 49 U.S.C.A. § 13(4), was an inadvertence. On the latter proposition, the language, to be an accurate statement of the law, would have to contain the qualification that such separate treatment would be unnecessary only if the evidence failed to indicate the substantial similarity in both areas of all factors affecting rates within the doctrine of Illinois. As so interpreted, and considering the comments of Judge Mize on the evidence, or lack of it, as reasons why such comparable conditions were not established in the record, the decision is meaningful and compelling here.

In a similar case, appearing to be the latest to come before the Supreme Court, State of North Carolina v. United States, D.C.E.D.N.C., 1955, 128 F.Supp. 718, 721, affirmed 1956, 350 U.S. 805, 76 S.Ct. 45, 100 L.Ed. 723. Judge Parker held for the Court that the ultimate findings of the Commission were supported by the evidence. Among these ultimate findings was one corresponding to a finding now before us that " 'The conditions incident to the intrastate transportation of freight in North Carolina are not more favorable than those incident to the interstate transportation in North Carolina and in the adjoining states.' " It was pointed out that the Commission had held a hearing for four days at which a great volume of testimony was received. But the sufficiency of the evidence was not an issue in this case. Judge Parker points out, 128 F.Supp. at page 721, " * * * there is no contention that this finding of evidentiary facts is not amply supported by the evidence in the case. It is not necessary to repeat them here; but it is sufficient to say that they fully support the ultimate findings of the Commission

* * *." The opinion in the North Carolina case does suggest, however, that there was more specific and pertinent evidence of common factors affecting rates than was before the Commission in the present case. I do not mean to discount this decision as a respected authority, but because of differences appearing in the nature of the evidence and the fact that the significant issue here was not raised in that case, I do not deem it to be controlling.

## II.

It is conceded that the ultimate findings of the Commission, quoted in a footnote to Judge Pickett's opinion, support the order, since they are couched in language designed to comport with the doctrine of Illinois, and closely follow the form of the ultimate findings approved in the King case. When the subsidiary findings of the Commission are looked to, however, a different picture is presented, even apart from evidentiary foundations or lack of them. Except for general references to the similarity of conditions as between intrastate and interstate commerce and certain unsupported conclusions discounting the effect of the affirmative evidence adduced on behalf of those opposing the increase, the facts set out in these subsidiary findings seem to recognize a substantial difference in conditions affecting rates. The report notes, among other things, that based on annual reports filed by four of the principal respondents with the Utah Commission, it appears that the interstate freight-service ratio (freight-service expense divided by freight-service revenue) and the intrastate density (ton-miles per mile of main-line track) are as to each respondent more favorable than correspondent systemwide figures, for 1953 as shown in the report. Such figures showing a very marked difference are set out in the report. But with reference to these, the Commission adds:

" * * * The Union Pacific and the other respondents dispute the validity of the results obtained from the application of the formula. They assert that the reports do not reflect the actual cost of operation in Utah and therefore afford no basis for comparing operating costs. One of the principal objections to the density above shown is that they were obtained by using only the miles of main track. The density results would be substantially reduced if branch-line mileage were included. The comparisons thus made are of little significance in our determination here. A more important consideration is the positive showing made upon this record that the average unit expense of servicing Utah intrastate traffic is at least as great as that of servicing interstate traffic to and from Utah."

The evidentiary basis in the record of the statement that a positive showing was made that the average unit expense of servicing Utah intrastate traffic is at least as great as that of servicing interstate traffic to and from Utah, cannot be found in the transcript, nor can I find it referred to in the briefs of the respondents. The record seems devoid of a comparison of conditions bearing on the reasonableness of rates, except for such common factors as were held in the first North Carolina case to be insufficient in the findings to support an order. It does not seem enough for the Commission to point to evidence of admitted differences in relevant factors and to say that the differences are not as great as those opposing the increases claim, without some basis in the record upon which to premise a finding that the differences are not substantial. The fact that in arriving at density figures combination main-line and branch-line track was not considered, does not seem to render the data insignificant, since the comparison was based upon main-line track nationally as well as locally. No facts appear which make the conclusion rational that the density figures would, on any theory, represent a factor having no substantial bearing on the reasonableness of the respective rates. It does not

seem enough to say that the substantial effect was not as great as if both main-line and branch-line figures had been presented, or to ignore that effect because of vague "average unit expense" figures, neither qualitatively nor quantitatively compared therewith.

The subsidiary findings refer to an exhibit submitted by the Utah Commission portraying various operating statistics of the Denver and Rio Grande Western in Utah and Colorado, and for the entire system. This data on its face appears clearly to support a conclusion contrary to that arrived at by the Interstate Commerce Commission. The Commission dismisses the evidence by reference to its action in Kansas City Chamber of Commerce v. Atchison, T. & S. F. Ry. Co., 164 I.C.C. 302, quoting its determination there, that the method of allocating revenues and expenses to a particular state was open to so many serious objections that the results obtained were unreliable. These objections were not developed in the evidence here, and no more reliable data were presented. In a similar summary manner, the study of the Utah Commission based on carload waybill statistics for 1952 showing the Utah intrastate ton-mile revenue as compared with the revenue per ton-mile on interstate shipments originated during that year, separated as to the principal commodity groups, was dismissed as "not determinative of the issues before us", due to "marked differences in the length of haul as between intrastate and interstate traffic."

The prevailing opinion places stress upon the evidence that there is no discrimination in the handling of intrastate and interstate freight shipments, since they are both handled on the same trains, by the same crews, and by the same departments and it is stated that "Under such conditions, the contention of the plaintiffs has been rejected by the courts." I cannot find that any court has gone to the extent of holding that such common treatment furnishes a basis of applying intrastate rate increases in the absence of evidence showing similar conditions with reference to all factors affecting rates.

It is true that Mr. Kroll testified on behalf of the railroads that no distinction is made between the two types of traffic; that the same crews, the same clerks, and the same trains haul interstate and intrastate traffic; that traffic is intermingled as between interstate and intrastate; and that intrastate shipments and interstate shipments move under "identically the same conditions". If an intrastate case can be made on such general testimony, largely within common knowledge, a hearing should not be necessary. Yet as far as the similarity of conditions affecting costs (as distinguished from actual rates charged without reference to cost) is concerned, this seems typical of the testimony on which reliance must be placed if the order is upheld.

Other evidentiary matters mentioned in the prevailing opinion as a foundation for the Commission's conclusions are believed insufficient to permit plausible inferences to that effect in view of the record as a whole. Such disparity of rates as were shown are in both directions, and it is well established that mere disparity of rates establishes no sufficient bases for such an order. The railroads' need for additional revenue in general is beside the point. That the total yearly loss to the railroads caused by the failure to grant the requested increase in Utah was estimated at $1,880,347 means that a percentage increase applied to an existing rate theoretically will yield increased revenue. This has no probative force in regard to the problem at hand. To the extent that the record indicates that earnings on the railroads' investments in Utah are below the national average, their more favorable position locally from a cost standpoint in respect of density of traffic and the large percentage of intrastate freight carried in gondola cars from mines may not be ignored.

That economic conditions in Utah as of 1950 have improved greatly over the preceding period seems to have no de-

terminative effect on a Section 13 case, since it is not the ability of intrastate traffic to pay more than its fair share that is involved, but whether the intrastate rate is so low as to be an economic burden on interstate commerce. Furthermore, there seems much force to the plaintiffs' argument that Utah's present economic status, if anything, militates against the Commission's conclusion since it suggests that in past years, while Utah's traffic has been essentially agricultural and relatively unproductive of revenue, its rates have moved up as a result of increases corresponding to nationwide increases, and that now that its economy has changed to predominantly mining and industry, the relative productivity of the traffic to the railroads would make the recent nationwide increases fairly inapplicable intrastate. Be this as it may, and conceding that evidence of general economic conditions locally may be helpful on other phases of a rate case, they do not tend to show that all factors affecting rates are substantially the same as between interstate and intrastate commerce for the purpose of the doctrine announced in Illinois. The figures on percentage of return on net investment of the railroads in Utah cited in the majority opinion follow no pattern logically adaptable to the Commission's conclusion. Thus, the latest percentage, 3.82% in 1953, is more than in 1949 and more than in 1951 but less than in 1948, 1950 and 1952. Comparative revenue figures per ton-mile, covering interstate and intrastate traffic lumped together without taking into consideration differences affirmatively shown to exist in factors affecting the respective costs, again may have a bearing on other phases of a rate case, but furnish no rational basis for concluding that all factors affecting costs are substantially the same for interstate and intrastate traffic, for they go no further than to suggest, if anything, a disparity in rates which admittedly is not enough. State of North Carolina v. United States, 325 U.S. 507, 65 S.Ct. 1260, supra.

Singly or in combination these factors, when viewed in context with the whole record, are believed not to supply a rational basis for the conclusion that the conditions attendant the intrastate transportation of freight in Utah are not more favorable than those incident to interstate transportation between Utah and adjoining states.

### III.

Three unwarranted assumptions would seem necessary to logically sustain the decision of the Commission. One would be that prior to the application of the 15% increase nationwide, intrastate and interstate rates in Utah were in balance with reference to the cost-revenue factor so that each furnished its fair share of the total revenue needs. If this presumption could be applied in the absence of evidence in the record to support it, or in view of the kind of evidence before us, the making of a rate case would be exceedingly simple; i. e., (a) the rates, intrastate and interstate in Utah prior to the application of the nationwide increase affecting interstate commerce provided in Ex Parte 175 were reasonably in balance; (b) interstate rates have been increased 15%, and thus, intrastate rates are out of line by this percentage; (c) by increasing intrastate rates 15% the two classes are restored to balance so that each furnishes its fair share of general revenue requirements.

Another presumption would have to be indulged: that between the time of the last simultaneous increase, or at least subsequent to the increase under Ex Parte 175, no new factors affecting costs have developed to throw the presumed balance out. The basis of this is furnished, if at all, by the testimony concerning the intermingling of interstate and intrastate traffic, which, as has been pointed out, is insufficient.

And there is another assumption that is required if the deficiencies are to be avoided. On the whole record it appears without dispute that there are different factors operating in progres-

sive measure to influence intrastate rates as distinguished from rates interstate from the standpoint of the revenue-cost ratio. The rapid development of the industrial and mining economy of Utah in relation to the nation as a whole, and its established incidents, including increasing traffic density, underscore the dissimilar conditions. No evidence to disprove this divergence nor to define, limit or measure its effect appears. The Commission in its report, however, as above pointed out, dismisses the significance of these factors and other studies directly measuring the differences, not on the basis of any opposing studies or evaluations introduced at the hearing but, for example, in one instance by a general conclusion as to comparative unit costs finding no support in the evidence, and in another instance by referring to its determination in an entirely different case.

May it be assumed, without evidence in the record which would furnish a rational basis in and of itself, that as an agency presumably equipped or informed by experience to deal with a specialized field of knowledge, its conclusions are valid and unassailable here? If this be so, the pattern for virtually automatic application of nationwide rate increases to intrastate commerce would be complete.

But no decision of the Supreme Court countenances any such result. Interstate Commerce Commission v. Louisville & Nashville Railroad Company, 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431, expressly rejects the contention that "expertness" may take the place of evidence. As recognized by Judge Pickett, Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, authorizes the Court to set aside an order when it cannot conscientiously find that the evidence supporting it is substantial, when viewed in the light that the record furnishes, including the body of evidence opposed to the agency's views. In a recent commentary on the authorities in this field appearing in Harvard Law Review, April, 1956, p. 1020, et seq., Professor Louis L. Jaffee expresses it as follows (p. 1027):

"* * * Judicial review is designed, as has been said, to make sure that there is record evidence which provides a rational or logical basis for the finding and for the consequent presumption that the finding was in fact the product of reasoning from evidence. This must mean evidence in the case and in the context of the case. To abstract out of a case that part of the evidence which can be made to support a conclusion is to imagine an abstract case, a case that was never tried. * * * *"

And he further comments (p. 1040):

"Courts usually demand that the particular agency convince the Court that its 'putative' expertness is relevant to the finding in question and even then takes this expertness as but one factor in the agency decision which must run the gauntlet of its common sense."

Chief Justice Hughes in Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 217, 83 L.Ed. 126, says that substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

The requirements of the Interstate Commerce Act, 49 U.S.C.A. § 13(4), that a "full hearing" be had, coupled with the provisions of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., negative the idea that the Interstate Commerce Commission, without evidence of substantial similarity of all factors affecting rates, and in the face of evidence showing dissimilar conditions, can, solely on the basis of its previous experience and authority, ignore the record and come to a determination independent of it. See also Amarillo-Borger Express, Inc., v. United States, D.C.N.D.Tex., Dallas D., 1956, 138 F.Supp. 411. The legal effect of evidence is a question of law and a finding without evidence is beyond the jurisdiction of the Commission. Where the party affected is entitled to a

hearing, the Interstate Commerce Commission cannot base an order establishing a rate on the information it has gathered for general purposes; the order must be based on evidence produced in the particular proceeding. Interstate Commerce Commission v. Louisville & Nashville Railroad Company, supra.

In reading the transcript before the Interstate Commerce Commission one may detect impatience on the part of some of the witnesses exposing the increase at any suggestion that they were called upon to produce a quantum of proof going to anything beyond an intimate connection between interstate and intrastate traffic in Utah and the difference in rates without the application of the 15% increase to intrastate traffic. In the argument before this Court the thesis was pursued that on the basis of common knowledge as to conditions in every state in the Union it could be said that all factors influencing rates were the same, and it was intimated that without evidence these matters of common knowledge would themselves justify the application of similar increases to the two classes of traffic. I fear that this is where the order of the Interstate Commerce Commission is leading us; that henceforth, if such orders be approved now that the problem has been squarely raised (as it does not appear to have been before) there will be no use for hearings before either the state commissions or the Interstate Commerce Commission with regard to intrastate rates, except as a mere formality in approval of nationwide increases.

What is substantial evidence is a matter on which there can be understandable differences of opinion for at best this is not a precisely measurable quantity or quality of evidence. However, it is the duty of each member of the court to determine whether minimum jurisdictional requirements have been met. I do not believe that they have been here, and with due regard for the considered majority view to the contrary, there can be no question at least but that the issue is worthy of focused consideration. The amount of money involved is considerable. It is vital that the railroads' rates, both intrastate and interstate, be adequate, and that the former should bear its full share of general revenue needs, but the relationship between state and federal governments is also important and delicate; and it is important that no rules be laid down which will impair that relationship contrary to the principles which Congress in the light of court decisions has laid down. To thus regard it will place no roadblock in the path of the railroads in obtaining adequate rates intrastate. It will establish some signals which I believe should be observed for the protection of our entire system. It neither compromises nor weakens legitimate federal power in the field of commerce to expect that the basis for the exercise of that power be shown affirmatively by substantial evidence. Such insistence may appear to be a protection solely to the public one day, to the state on another, or to the railroads on yet another; but the by-passing of such requirement can, in the long run, injure all and may, through reaction, impair the power itself.

I would vacate the order of the Interstate Commerce Commission and enjoin the application of the increased intrastate rates until, if at all, substantial evidence is presented before the Interstate Commerce Commission furnishing a rational basis for the conclusion that conditions under which intrastate and interstate traffic move in Utah are substantially the same with respect to all factors bearing on the reasonableness of the rates.